# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

MICHAEL WEBB,

                                         :

        Petitioner,                        Case No. 1:98-cv-766

                                         :       District Judge Susan J. Dlott

        -vs-                              Chief Magistrate Judge Michael R. Merz

BETTY MITCHELL, Warden           :

        Respondent.

---

## REPORT AND RECOMMENDATIONS
_____

       Petitioner, Michael D. Webb brings this habeas corpus action pursuant to 28 U.S.C. § 2254.

       In his Petition for Writ of Habeas Corpus, Webb pleads fifteen claims for relief from the imposed death sentence. (Doc. No. 41.)  Through counsel of the Ohio Attorney General's office, Respondent, Betty Mitchell (hereinafter "Respondent"), warden of the Mansfield Correctional Institute, filed a Return of Writ on April 15, 1999 and an Amended Return on August 6, 2001, asking this Court to deny Webb's Petition for Writ of Habeas Corpus[1]. (Doc. No. 17); (Doc. No. 42.)

       In his Petition for Writ of Habeas Corpus and its amendments, Webb pleads the following fifteen grounds for relief:

       1.     There was pervasive prosecutorial misconduct during the

---

[1]Petitioner did not file a Traverse in response to Respondent's affirmative procedural defenses.  Petitioner did however argue against procedural default in his Motion for an Evidentiary Hearing, Doc. No. 49.

culpability stage of the trial.

    A.     Opening statement

    B.     Presentation of Evidence

    C.     Prosecutorial Misconduct during final argument

2.     Petitioner received ineffective assistance of counsel during the culpability phase of the trial.

3.     The trial court improperly instructed the jury at the culpability phase of the trial. This destroyed any confidence in the jury's verdict.

    A.     The trial court improperly instructed the jury when it explained the definitions of "purpose" and "specific intent."

    B.     The trial court instructions also improperly defined "cause" in a manner that negated the definition of "purpose" and "specific intent." These instructions, although addressed to the issue of causation, negated the *mens rea* requirement for aggravated murder. The causation instructions permitted the jury to convict the Petitioner without finding beyond a reasonable doubt that he acted with the purpose and the specific intent to cause the death of another.

4.     There was continued prosecutorial misconduct during the punishment phase of the trial. The prosecutor engaged in misconduct during final argument in the penalty trial . . . .

5.     The trial court continued to improperly instruct the jury during the penalty phase of the trial. This destroyed any confidence in the jury's verdict of death.

    A.     The instructions improperly defined proof beyond a reasonable doubt.

    B.     The instruction allowed the jury to consider "bad act" and "bad character" evidence as relevant to punishment despite the fact that the Petitioner never put his character at issue.

    C.     The instructions were inaccurate and misleading in a way that improperly diminished the jury's sense of responsibility in sentencing by stating that even if the jury

recommends that the death penalty be imposed, the recommendation is just that, and it is not binding on the Court. "<u>The final decision</u> as to whether the death penalty should be imposed upon the defendant <u>rests on this Court after the Court follows certain additional procedures required by the laws of this State</u>." This instruction was incorrect and misleading because it suggested to the jury that additional evidentiary procedures and safeguards existed which were not in effect in Ohio and thereby unconstitutionally increased the risk that the jury would return a verdict of death.

6.    Petitioner received ineffective assistance of counsel at the punishment (sentencing) phase of the trial
      A.    Lack of basic trial preparation
      B.    Lack of knowledge regarding the law in capital litigation as reflected in the presentation of improper jury instructions.
      C.    Lack of knowledge regarding the law in capital litigation as reflected during jury selection in the "death qualification" portion of voir dire.

7.    The jury which convicted the Petitioner was improperly constituted.

8.    Petitioner's conviction and/or sentence are void or voidable because the prosecutor unconstitutionally engaged in misconduct during discovery . . . .

9.    Petitioner's conviction and sentence were void or voidable because the trial judge was unaware of the appropriate legal standards . . . .

10.    Petitioner's conviction and sentence are void or voidable because his attorney in this matter also represented a prosecution witness during his representation of Petitioner. This actual conflict of interest resulted in ineffective assistance of counsel to Petitioner.

11.    The state post conviction scheme as applied offered the

3

Petitioner an inadequate corrective process for the factual development, hearing and determination of claims of violation of federal constitutional guarantees.

12.     Petitioner Webb's conviction and/or sentence are void or voidable because of State induced error, to wit: The State of Ohio, through the State Public Defender's office, impeded the defense of the Petitioner by providing an appallingly inadequate investigation for use by Petitioner's counsel.

13.     Petitioner Webb's conviction and sentence are void or voidable because of the cumulative effects of the errors and omissions presented in this petition.

14.     The statutory provisions governing the Ohio capital punishment scheme, as applied to the Petitioner, violate the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

15.     Petitioner's conviction and sentence are void or voidable because Ohio retroactively applied a new rule, during appellate review, changing the quantum of proof required for conviction and altering the defense relied upon at trial that "circumstantial evidence used to prove an essential element of a crime must be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilty," in violation of the ex post facto prohibition contained in Article I, § 10 and Due Process guarantees as incorporated in the Fifth and Fourteenth Amendments to the United States Constitution.

(Second Amended Petition under 28 U.S.C. Section 2254 for a Writ of Habeas Corpus by a Person in State Custody, "Second Amended Petition," Doc. No. 41.)

*Facts*

The facts of the crime as reported in the decisions of the state courts are as follows[2].

In the early morning hours of November 21, 1990, the Webb home in Goshen Township, Clermont County, caught fire.  All family members –  Petitioner Michael D. Webb, his wife Susan, and his children Tami, Amy, Michael, and Charlie -- were in the residence at the time of the fire. Three-year- old Michael "Mikey" Patrick was killed in the blaze.

Immediately prior to the fire, Tami Webb awoke in her basement bedroom, to the feel of cold air and the smell of gasoline.  Her father, Petitioner Webb, came into her room and told her that he thought the house might be rigged and that she should "get down" or "lie down" and to "get Amy." He did not tell her, nor any other family members, to leave the house immediately.  Webb returned upstairs.  Tami stayed in her bed and closed her eyes.  She originally claimed that when she opened her eyes she saw a man in a red sweatshirt or jacket looking at her.  She later stated that she sensed or felt that there was someone else in the house.

Immediately after Webb  returned upstairs, there was an explosion from the upper portion of the home.  Tami and Amy escaped through the basement door.  They ran to the front of the house where they saw Webb, his hands bloody as a result of his escape from the home by breaking out the bathroom window.  Neighbors and firefighters attempted a rescue of the remainder of the Webb family.  Susan and Charlie were pulled from the master bedroom, but by the time rescue workers found Mikey, he was already dead from smoke inhalation.

---

[2]  *State v. Webb*, 1993 WL 181988 at *3-4 (Ohio App. 12th Dist. 1993); *State v. Webb*, 70 Ohio St. 3d 325, 638 N.E. 2d 1023 (1994).

After a thorough examination of the home, Goshen Township Fire Chief Virgil E. Murphy concluded that the fire was a result of arson, and that there had been two ignition points.  A plastic gasoline can which was usually kept inside the Webb's garage was discovered in the front foyer. A gasoline pour pattern or "trailer" was discovered in the foyer, leading down the hallway to the bathroom door and into the bedrooms.  The trailer split, with one branch going into the master bedroom up to the base of the bed and next to Charlie's crib.  The other branch of the trailer went into Mikey's room "up the side of the bed and across the bed to the rear wall."  An additional unignited gas trailer led downstairs to the basement.  Gasoline had been poured on Tami's bed and traces were also found on Amy's bedclothes.  A two liter pop-bottle containing gasoline was found on the stairs to the basement.  Webb's fingerprints were found on the bottle.  Fire investigators concluded that the trailers had been set from two locations, a hall closet, and right in front of the bathroom door.  The fire chief opined that, had all the trailers ignited, no one would have been able to escape the home.

During their investigation, police discovered bloodstains, matching Webb's blood type,  on the bathroom windowsill and basement door.  The bathroom window had been broken from the inside of the home and there was a trail of blood leading away from the window.  Police also discovered a matchbook in the toilet and another outside the basement door.  The second matchbook contained a partial fingerprint in blood.  Webb later admitted to police that the fingerprint was his, stating that he discovered the matchbook after he exited the burning home, picked it up, then thought it might be evidence and placed it back on the ground.  The positioning of the fingerprint on the matchbook is very unusual and was found to be consistent with the unique way Webb held a book of matches when lighting one.

6

For the purposes of establishing the State's theory of motive, this Court must delve into Webb's past actions. In 1978 Webb's first wife, Linda, and Linda's mother were involved in a fatal car accident. Amy and Tami received a total settlement of $42,667.33 for personal injury and wrongful death, plus an additional $7,567.42 from their grandmother's estate. The probate court appointed Webb the guardian of Tami and Amy's estate. Webb invested the money in certificates of deposit ("CD"), and would cash out the CDs, purchase another one at for a lesser amount, and pocket the difference. Additionally, he instructed the bank that all interest made on the CDs was to be deposited into his personal checking account. This was done approximately seven times between 1985 and 1988. Beginning in 1983 Webb failed to file accountings on the estate with the probate court as required[3]. In 1987 he received notice from the court to either file an accounting immediately or he would be removed as guardian of the estate. Webb went before the judge and informed him that he had spent his daughters' entire estate and he knew he had to replace it.

Shortly thereafter, Linda Webb's father died, leaving his granddaughters $51,059.66. Webb failed to report this to the probate court as part of the girls' estate and rather, again, misappropriated the funds. After cashing out multiple CDs prematurely and reinvesting in new ones of lesser value, Webb eventually used the money to open a savings account in his own name. The probate judge on the case stated that at the time of the final accounting he would have to inform the girls of the status of their guardianship and that their entire estate was gone.

After the tragic events of November 21, 1990, Webb's story began to show multiple inconsistencies. Webb told one of his brothers-in-law that a firebomb had been thrown through the

---

[3]Accounting, a filing of real and personal property in the estate, was required at least once every two years. It is also required that a final accounting be made within 30 days after the termination of the guardianship when the youngest turns 18. At the time of trial, the final accounting had not yet become due as Amy was 17.

window.  He later told another brother-in-law, as well as Tami and Amy, (and the evidence later showed) that he himself had broken the bathroom window to get out of the burning house.  He further explained that he had been on his way to the master bedroom to get Susan, but the force of the explosion propelled him into the bathroom.

Webb began to name potential suspects as people that may have been angry enough to commit this crime against his family, the first of which being Ben Puckett.  Ben Puckett is the husband of Nadine Puckett, a friend of Webb's.  Though there have been conflicting stories as to the nature of their relationship, there is evidence of a romantic relationship of sorts between Nadine and Webb.  Nadine stated that she was in love with the Petitioner and that the feelings were reciprocated and Webb was planning on leaving Susan so that they could be together.  Ben Puckett became angry after finding Petitioner and Nadine embracing in the kitchen of Nadine's restaurant.  Shortly after this incident Nadine moved to Dayton to live with her sister.  Phone records show frequent communication between Nadine and Webb during this time period.

The second potential suspect, according to Webb, was an ex-employee by the name of James Pursifull.  Pursifull was at one time an employee at Webb's autobody shop, but quit on October 23, 1990.  Webb told people that he had in fact fired Pursifull and stated that as a result Pursifall was threatening and harassing him and his family.

Police investigated both men and determined that they were not suspects in this case.

At an evidentiary hearing on May 29 and 30, 2003, Webb alleged that there was an additional suspect, Robert Gambrel.  Gambrel was a high school boyfriend of Amy Webb and had spent enough time at the Webb residence to be familiar with the layout of the home.  Webb alleged that at one point in time he had thrown Gambrel out of the house and forbade Amy to see him.

8

Webb argued this resulted in a grudge which may have served as a motive in conjunction with the fact that at the time Gambrel owned a red Goshen high school letterman jacket and there were conflicting stories of Gambrell's whereabouts and physical condition the morning of the fire, and alleged comments made by Gambrel[4] should have prompted an investigation as a possible suspect.

### Procedural History

Petitioner was indicted January 10, 1991, by the Clermont County Grand Jury on two counts of aggravated murder in violation of Ohio Rev. Code § 2903.01.  In regard to the murder count, Webb was also charged with two death penalty specifications: that the offense was committed as part of a course of conduct in which Webb purposely killed or attempted to kill two or more persons; and that as the principal offender Webb committed the offense while committing, or attempting to commit aggravated arson and was the principal offender in the commission of the aggravated murder, or committed the aggravated murder with prior calculation and design.  Additionally, he was charged with four counts of attempted aggravated murder in violation of Ohio Rev. Code §§ 2903.01 and 2923.02; six counts of aggravated arson in violation of Ohio Rev. Code § 2913.02.

On June 25, 1991, a Clermont County jury found Webb guilty on all counts. (Return of Writ, Doc. No. 17 at Exhibit B.)

---

[4]A classmate, Tracy Jordan, another girl that Gambrell had an on-off again relationship, at one point told police that Gambrell had come to school without his letterman jacket, smelling like gasoline and that he had stated that he "hoped it was Amy's house that burnt up."  When interviewed at a later time, she claimed that he did not smell like gasoline.  Gambrell denies making the comment and says that he actually said, he "hoped it was not Amy's house that burnt up."  There are also conflicts in whether Gambrell had been absent the entire day from school or had been late to school.

On July 16, 1991, the jury recommended a sentence of death on the first two counts of aggravated murder. *Id.*  It was further recommended that Webb receive seven to twenty-five years for each count of attempted aggravated murder, seven to twenty-five years on the first two counts of aggravated arson, ten to twenty-five years on each of the remaining aggravated arson counts, and five to fifteen years on the aggravated theft charge, all sentences to be served consecutively. *Id.*  The first two counts were merged in sentencing.  The court adopted the recommended sentence in full on July 18, 1991.

In his direct appeal to the Clermont County Court of Appeals, Webb advanced twenty-six assignment of errors.  After reviewing the merits of Webb's assignment of errors, re-weighing the aggravating circumstances against the mitigating factors, and independently assessing the appropriateness of the penalty of death, the court of appeals affirmed Webb's conviction and the sentence of death. *State v. Webb*, 1993 WL 181988 at *3-4 (Ohio App. 12th Dist. 1993).  In Webb's direct appeal to the Supreme Court of Ohio, he raised twenty-six propositions of law.  The Ohio Supreme Court reviewed the merits of Webb's propositions of law.  In addition, the court independently re-weighed the aggravating circumstances against the mitigating factors presented at trial and evaluated the appropriateness and proportionality of the death penalty.  The court found that Webb's claims were without merit and affirmed the decision and sentence. *State v. Webb*, 70 Ohio St. 3d 325, 638 N.E. 2d 1023 (1994).  Webb then sought review by *certiorari* in the United States Supreme Court, which declined to consider the case. *Webb v. Ohio*, 514 U.S. 1023 (1995).

On December 11, 1995, Webb filed his petition for Post-Conviction Relief in the Clermont County Court of Common Pleas under Ohio Revised Code § 2953.21, pleading thirty-eight claims for relief.  The Court of Common Pleas for Clermont County found that Webb was not entitled to

relief on any of his thirty-eight claims for relief and denied the petition for post-conviction relief on cross-motions for summary judgment. (Return of Writ, Doc. No. 17 at Exhibit U.)  The court of appeals affirmed the dismissal of the post-conviction petition. (Return of Writ, Doc. No, 17 at Exhibit X.)  Webb then appealed to the Ohio Supreme Court which declined to review the judgment of the lower courts based on jurisdictional grounds and failure to raise a substantial constitutional question. (Return of Writ, Doc. No. 17 at Exhibit BB.)

On May 1, 1998, Webb filed an Application to Reopen his direct appeal under Ohio R. App. P. 26(B), alleging that his direct appeal counsel had been constitutionally ineffective for their failure to raise nine new assignments of error.  The Application for Reopening was denied because Petitioner had not filed in a timely manner nor demonstrated good cause for the delay in bringing the application. (Return of Writ, Doc. No. 17 Exhibit Vol. II at FF.).  Petitioner appealed to the Ohio Supreme Court, which affirmed.  *State v. Webb*, 85 Ohio St. 3d 365, 708 N.E. 2d 710 (1999).

Webb filed a petition for Writ of Habeas Corpus in the this Court on October 21, 1998, which he has twice amended.  Respondent Betty Mitchell filed a Return of Writ on April 15, 1999, and an Amended Return on August 6, 2001.  The Court held an evidentiary hearing on May 29 and 30, 2003.

## ANALYSIS

The Antiterrorism and Effective Death Penalty Act ("AEDPA" or "the Act") was signed and took effect on April 24, 1996.  Webb filed his Petition for Writ of Habeas Corpus on October 21,

1998, and amended it on March 19, 1999, and June 21, 2001. (Petition for Writ of Habeas Corpus,

Doc. No. 11); (First Amended Petition, Doc. No. 14); (Second Amended Petition", Doc. No. 41.)

As Webb's petition was submitted after the Act was signed it is subject to its provisions. 28 U.S.C.

§2254(d), as amended by the AEDPA, provides:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim-
>> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> (e) (1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Any factual finding made by the state court is presumed to be correct and a petitioner must rebut the

presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e); *Mitchell v.

Mason,* 325 F. 3d 732, 737-38 (6th Cir. 2003); *Warren v. Smith,* 161 F. 3d 358, 360-61 (6th Cir.

1998). A state court's decision is contrary to the Supreme Court's clearly-established precedent

if (1) the state court applies a rule that contradicts the governing law as set forth by the Supreme

Court case law, or (2) the state court confronts a set of facts that are materially indistinguishable

from those in a decision of the Supreme Court and nonetheless arrives at a result different from

Supreme Court precedent. *Terry Williams' v. Taylor*, 529 U.S. 362 (2000). A state court's decision

involves an unreasonable application of clearly established federal law "if the state court identifies

the correct governing legal rule [from Supreme Court] but unreasonably applies it to the facts of the

particular state prisoner's case," "if the state court either unreasonably extends a legal principle from

[Supreme Court] precedent to a new context where it should not apply[,] or [if the state court]

unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529

U.S. at 407-08.

In *Jamison v. Collins*, 100 F. Supp. 2d 647 (S.D. Ohio 2000), Judge Spiegel of this Court

noted that:

> Principles of comity necessary to a federal system narrow a federal
> court's review of a petition of a for a writ of habeas corpus brought
> by a state prisoner. *See Coleman v. Thompson*, 501 U.S. 722, 731-32,
> 111 S.Ct. 2546, 115 L.Ed. 640 (1991). The Supreme Court explains
> that "[u]nder our federal system, the federal and the state 'courts [are]
> equally bound to guard and protect rights secured by the
> Constitution.'" *Rose v. Lundy*, 455 U.S. 509, 518, 102 S.Ct. 1198, 71
> L.Ed.2d 379 (1982) (*quoting Ex parte Royall*, 117 U.S. 241, 251, 6
> S.Ct. 734, 29 L.Ed. 868 (1886)); *see Coleman*, 501 U.S. at 731, 111
> S.Ct. 2546 (*quoting* the same). Thus, to ensure the states an
> opportunity to protect these rights, the doctrine of procedural default
> requires that the state court retain "the first opportunity to protect
> these rights, the doctrine of procedural default requires that the state
> court retain "the first opportunity to address and correct alleged
> violations of state prisoner's [sic] rights." *Coleman*, 501 U.S. at 731,
> 111 S.Ct. 2546. The doctrine of procedural default provides that, if
> a state court previously dismisses a state prisoner's federal claim on
> the grounds that the prisoner failed to comply with a state procedural
> rule, then a federal court ordinarily cannot consider the merits of that
> federal claim. *Id*. at 729-730, 111 S.Ct. 2546.
>
> This procedural default doctrine bars federal habeas review of a state
> court ruling only if the following requirements have been satisfied:
> (1)    the petitioner actually violated an applicable state procedural
>        rule;
> (2)    the procedural violation provides an "adequate and

13

independent state ground" for denying the petitioner's federal constitutional claim; and

(3) the state court actually enforced the procedural violation; that is, the highest state court to rule on the claim clearly and ambiguously relied upon the procedural violation as the reason for rejecting the claim.

*See generally Coleman*, 501 U.S. at 750, 111 S.Ct. 2546.  However, the petitioner can excuse the procedural default by demonstrating either:

(a) that there was "cause" for the procedural default and actual prejudice by the alleged constitutional error; or

(b) that the case falls within the category of cases considered [a] fundamental miscarriage of justice." *See id*. . . ; *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *Harris v. Reed*, 489 U.S. 255, 260-62, 109 S.Ct. 1038, 103 L.Ed.2d 208 (1989); *Ylst v. Nunnemaker*, 501 U.S. 797, 802, 1121 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

For the cause and prejudice standard, the petitioner must provide a "substantial" reason that is "external" to the petitioner as the cause for the procedural default. *See Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994).  In addition, the petitioner must show that the alleged trial errors "not merely. . . created a *possibility* of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). [Emphasis in original.]

In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that the petitioner is "actually innocent."   To meet the "actual innocence" standard the petitioner must demonstrate that "it is more likely than not that no reasonable fact finder would have found petitioner guilty beyond a reasonable doubt" or "must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have

14

found the petitioner eligible for the death penalty under the applicable state law." *Schlup v. Delo*, 513 U.S. 298 (1995)(articulating the necessary standard to prove actual innocence of the crime in which the petitioner was convicted); *Sawyer v. Whitley*, 505 U.S. 333, 336, 350 (1992)(setting forth standard for which applies the *Schlup* "actual innocence" standard to the sentencing phase of the trial).

Petitioner must have exhausted all remedies available to him in state court before bringing forth his claims in federal court in a petition for habeas corpus. *See* 28 U.S.C. § 2254(b)(1). If the federal court finds that the petitioner has not exhausted his remedies, the court shall not grant relief. *See* 28 U.S.C. § 2254(b)(2). The requirement of giving state courts the first opportunity to cure a constitutional claim stems from the understanding that state courts are bound to follow federal law and from the desire for comity between the state and federal court systems. *O'Sullivan v. Boerckel,* 526 U.S. 838 (1999).

In the case at bar Webb has pursued both his direct appeal and his post-conviction claims to the Ohio Supreme Court. Although the Respondent argues that Webb is procedurally barred from raising many of his claims for relief, Respondent concedes that the exhaustion requirement is nonetheless satisfied. (Return of Writ, Doc. No. 17); (Respondent Betty Mitchell's Memorandum in Opposition to Petitioner's "Motion for Partial Summary Judgment", Doc. No. 21 at 4); *See Gray v. Netherland*, 518 U.S. 152, 160-161(1996).


**First Ground for Relief**

In his first ground for relief Webb argues that there was pervasive prosecutorial misconduct during the opening statement, presentation of evidence, and the final argument phases of the

15

culpability portion of his trial. (Second Amended Petition, Doc. No. 41 at 5.) Respondent counters that the majority of the sub-claims were not properly raised in state court and were therefore barred by *res judicata* and are procedurally defaulted. (Amended Return of Writ, Doc. No. 42 at 44.) In the alternative Respondent argues that all of these claims, except the claim of prosecutorial misconduct violating Petitioner's Fifth Amendment right of self-incrimination, involved matters of state rules of evidence and procedure and cannot be addressed in federal habeas corpus proceedings unless the state court rulings were contrary to or an unreasonable application of federal Supreme Court law and it would result in a miscarriage of justice. *Id*. at 52.

In the Report and Recommendations on Petitioner's Motion for Partial Summary Judgment (Doc. No. 35), which has been adopted by the Court (Doc. No. 36), the Court concluded that this Claim was procedurally defaulted.

**Second Ground for Relief**

Webb asserts in his second ground for relief that he received ineffective assistance of counsel during the culpability phase of his trial. (Second Amended Petition, Doc. No. 41 at 20.) He cites numerous examples of alleged ineffective assistance. *Id*. at 20-26. Respondent counters this claim by stating that all portions were raised in post-conviction relief and were held to have been barred by *res judicata*. (Amended Return of Writ, Doc. No. 42 at 54.) In the Report and Recommendations on Petitioner's Motion for Partial Summary Judgment (Doc. No. 35), which has been adopted by the Court (Doc. No. 36), the Court concluded that this Claim was procedurally defaulted.

16

**Third Ground for Relief**

In his third ground for relief, Webb contends that the trial court improperly instructed the jury at the culpability phase of the trial, destroying any confidence in the jury's verdict. (Second Amended Petition, Doc. No. 41 at 26.)  Respondent counters by arguing that the claim is procedurally defaulted as it was raised for the first time in state court during post-conviction relief proceedings and was found to be barred by *res judicata*. (Amended Return of Writ, Doc. No. 42 at 58.)  In the Report and Recommendations on Petitioner's Motion for Partial Summary Judgment (Doc. No. 35), which has been adopted by the Court (Doc. No. 36), the Court concluded that this Claim was procedurally defaulted.

**Fourth Ground for Relief**

In his fourth ground for relief, Webb alleges that the State continued to engaged in misconduct including during the punishment phase of his trial. (Second Amended Petition, Doc. No. 41 at 32.) He cites to references such as; the use of a biblical reference, misrepresentation of the weighing process in the mitigation phase, injection of personal opinion into the argument, improper reference to mitigation as mercy, argued non-statutory factors, commented on the fact Petitioner failed to testify, and suggested that family members that had testified were "programmed" by Webb. *Id.* Respondent argues that all portions of this claim, excluding the sub-claim of non-statutory aggravating circumstances, are procedurally defaulted. (Amended Return of Writ, Doc. No. 42 at 61.)  In the Report and Recommendations on Petitioner's Motion for Partial Summary Judgment (Doc. No. 35), which has been adopted by the Court (Doc. No. 36), the Court concluded that this

17

Claim was procedurally defaulted.

**Fifth Claim for Relief**

In his fifth claim for relief Webb asserts that the trial court improperly instructed the jury during the penalty phase of the trial, thus destroying any confidence in the verdict. (Second Amended Petition, Doc. No. 41 at 33.)  Respondent argues that this claim is procedurally defaulted because portions of it were raised for the first time during post-conviction relief proceedings and other portions of the claim were not raised at all prior to federal court proceedings. (Amended Return of Writ, Doc. No. 42 at 63.)

In the Report and Recommendations on Petitioner's Motion for Partial Summary Judgment (Doc. No. 35), which has been adopted by the Court (Doc. No. 36), the Court concluded that this claim was procedurally defaulted because it had not been raised on direct appeal and the state courts enforced a *res judicata* bar against it when it was first asserted in the post-conviction petition.  The Court rejected Petitioner's responses to the procedural default defense on the same basis as they had been rejected with respect to the First Claim for Relief.

In his Post-Hearing Brief, Petitioner pursues only the following portion of the mitigation phase instructions:

> To outweigh means to weigh more, to be more important than.  In this regard, it is the quantity of the evidence that must be given consideration by you, and the quality of the evidence may or may not be commensurate with the quantity of the evidence, that is, the number of witnesses or exhibits presented.

(Post-Hearing Brief, Doc. No. 69, at 11, quoting Mitigation Transcript at 131.)  As to this portion, of the instructions, Petitioner asserts he can overcome the procedural default defense, relying on

18

*Landrum v. Anderson*, 185 F. Supp. 2d 868 (S.D. Ohio, 2002)(Merz, M.J.).  Because the *Landrum* decision post-dates the Court's decision on Petitioner's Partial Motion for Summary Judgment on the procedural default defense, this claim requires fresh analysis.

Petitioner admits that this claim was first raised in post-conviction and that both the trial court and court of appeals found it barred by *res judicata*, as did this Court previously.  Petitioner however asserts that he raised this claim as an "example" of ineffective assistance of counsel in his Application to Reopen the Direct Appeal under Ohio R. App. P. 26(B), that the court of appeals rejected that application as untimely, and that the Ohio Supreme Court affirmed "for the reasons stated by the lower court." (Post-Hearing Brief, Doc. No. 69, at 12.)  Petitioner then notes that this Court in *Landrum* held that the timeliness portion of Ohio App. R. 26(B) was not an adequate ground of state court decision because it was not firmly established and regularly followed as of the time the *Landrum* decision was filed.[5]

The Ohio Supreme Court decided the appeal of Petitioner's Rule 26(B) application in April, 1999.  Neither party has presented argument or evidence on the state of enforcement of the timeliness rule in 1999 and therefore this Court assumes that *Landrum* applies to this case.  Therefore, Petitioner is not barred by the time limits in Ohio App. R. 26(B) from arguing that the ineffective assistance of his appellate counsel is cause for his failure to raise his Fifth Claim on direct appeal.

---

[5]The Ohio Supreme Court may again be enforcing the 26(B) timeliness rule.  In *State v. Gumm*, 103 Ohio St. 3d 162 (2004), the court enforced the 90-day rule against Darryl Gumm, stating "[c]onsistent enforcement of the rule's deadline by the appellate courts in Ohio protects on the one hand the state's legitimate interest in the finality of its judgments and ensures on the other hand that any claims of ineffective assistance of appellate counsel are promptly examined and resolved."  *Id.* at 163.

Before a habeas petitioner can rely on ineffective assistance of appellate counsel as cause to excuse a state court procedural default, he must first submit the claim of ineffective assistance of appellate counsel to the state courts.  *Edwards v. Carpenter,* 529 U.S. 446, 120 S. Ct. 1587, 146 L. Ed. 2$^d$ 518 (2000).  As noted, Petitioner did so in the only way permitted under Ohio law, by filing a Rule 26(B) application.[6]  Petitioner asserts the Ohio courts denied that application solely on the basis that it was untimely filed.  If this were so, the state courts' decisions on the ineffective assistance of counsel claims would have no impact on this Court's consideration of those claims. However, the Ohio Court of Appeals not only found the 26(B) Application to be untimely, it also decided the Application on the merits.  It held:

> Aside from the procedural deficiency, an application of this nature "shall be granted only . . . if there is a genuine issue as to whether the applicant was deprived of effective assistance of counsel on appeal." App. R. 26(B(5).  As used in this analysis, ineffective assistance of counsel is intended to comprise the two elements set forth in Strickland v. Washington (1984), 466 U.S. 668, 104 S. Ct. 2052, that is deficiency in the representation of appellant and prejudice resulting from such deficiency.  See App. R. 26, Staff Note.  See, also, State v. Watson (1991), 61 Ohio St. 3d 1, 16.
>
> Appellant suggests that appellate counsel was ineffective for failing to raise several additional assignments of error regarding jury instructions and for failing to raise trial counsel's ineffectiveness resulting from a lack of objections to the jury instructions.  Appellate counsel raised twenty-six assignments of error on direct appeal to this court, several of which alleged ineffective assistance of trial counsel. Counsel's failure to raise every issue in the court of appeals is not tantamount to ineffective assistance of counsel.  The process of "winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues," is far from

---

[6]Within ten days of judgment, the matter can also be raised by a motion for reconsideration under Ohio App. R. 26(A), but a defendant is highly unlikely to have found new counsel prepared to critique the performance of prior counsel and to have filed such a motion within ten days of judgment.

> evidence of incompetence, but rather the hallmark of effective
> appellate advocacy.  Jones v. Barnes (1983), 463 U.S. 745, 751-52,
> 103 S. Ct. 3308, 3312-13.

State v. Webb, Case No. CA91-08-053 (Ohio App. 12th Dist. July 7, 1998)(slip opinion at 4-5)(copy

at Exhibit FF, Appendix to Return of Writ, Doc. No. 17).  The Ohio Supreme Court acknowledged

that the Court of Appeals had dealt with both the timeliness issue and the merits and affirmed "for

the reasons stated in the court of appeals' Entry Denying Application for Reopening."  State v.

Webb, 85 Ohio St.3d 365, 367, 708 N.E.2d 710 (1999).

Since the Ohio courts reached a decision on the merits of this claim, this Court is bound

under 28 U.S.C. §2254(d) to give deferential consideration to those decisions.  The Supreme Court

has recently elaborated on the standard of review of state court decisions in federal habeas corpus:

> The Antiterrorism and Effective Death Penalty Act of 1996 modified
> a federal habeas court's role in reviewing state prisoner applications
> in order to prevent federal habeas "retrials" and to ensure that
> state-court convictions are given effect to the extent possible under
> law.  See Williams v. Taylor, 529 U.S. 362, 403-404, 120 S.Ct. 1495,
> 146 L.Ed.2d 389 (2000).   To these ends, § 2254(d)(1) provides:

> (d) An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the merits
> in State court proceedings unless the adjudication of the claim--
> "(1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States."

> As we stated in Williams, § 2254(d)(1)'s "contrary to" and
> "unreasonable application" clauses have independent meaning.  529
> U.S., at 404-405, 120 S.Ct. 1495.   A federal habeas court may issue
> the writ under the "contrary to" clause if the state court applies a rule
> different from the governing law set forth in our cases, or if it decides
> a case differently than we have done on a set of materially
> indistinguishable facts.  Id., at 405-406, 120 S. Ct. 1495.   The court

21

> may grant relief under the "unreasonable application" clause if the
> state court correctly identifies the governing legal principle from our
> decisions but unreasonably applies it to the facts of the particular
> case. *Id.,* at 407-408, 120 S.Ct. 1495.  The focus of the latter inquiry
> is on whether the state court's application of clearly established
> federal law is objectively unreasonable, and we stressed in *Williams*
> that an unreasonable application is different from an incorrect one.
> *Id.,* at 409- 410, 120 S.Ct. 1495.  See also *id.,* at 411, 120 S.Ct. 1495
> (a federal habeas court may not issue a writ under the unreasonable
> application clause "simply because that court concludes in its
> independent judgment that the relevant state-court decision applied
> clearly established federal law erroneously or incorrectly").

*Bell v. Cone*, 535 U.S. 685; 122 S. Ct. 1843, 1849-50; 152 L. Ed. 2d 914 (2002).

The Ohio courts' decision that Petitioner did not suffer ineffective assistance of appellate counsel with respect to the instruction complained of in his First Claim for Relief is not an unreasonable application of clearly established federal law.  First of all, the Court of Appeals cited the correct federal standards as embodied in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and *Jones v. Barnes,* 463 U.S. 745, 751 (1983).  "In order to succeed on a claim of ineffective assistance of appellate counsel, a petitioner must show errors so serious that counsel was scarcely functioning as counsel at all and that those errors undermine the reliability of the defendant's convictions."  *McMeans v. Brigano*, 228 F. 3d 674(6th Cir. 2000), citing *Strickland* and *Rust v. Zent*, 17 F. 3d 155, 161-62 (6th Cir. 1994).  Counsels' failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal.  *McFarland v. Yukins*, 356 F. 3d 688 (6th Cir. 2004), *citing Greer v. Mitchell,* 264 F. 3d 663, 676 (6th Cir. 2001), *cert. denied,* 535 U.S. 940 (2002).

First of all, it was not deficient performance to fail to include this claim on direct appeal. There had been no objection to the instruction at trial. Explaining his failure to object, trial counsel

for Petitioner, H. Fred Hoefle, a very experienced capital litigator, testified at the evidentiary hearing before this Court that he did "[N]ot think that it is necessarily erroneous, and not clearly erroneous in any event." (Evident. Hrg. May 29, 2003 T.p. at 59, 61); (Evident. Hrg. May 29-30, 2003 Respondent's Exhibit Three; Petitioner's Exhibit Two.)  He further stated that it was conceivable that the misstatement may actually work to the benefit of Petitioner rather than to his detriment. While Hoefle conceded that the instruction could have been more artfully articulated by the trial court, in reading the charge in its entirety, the quantity of the evidence is still restricted to the weighing process with the quality of evidence.  This Court concurs that any error made by the use of the word "quantity" in place of "quality" was corrected by the very next sentence of the charge stating that "the quality of the evidence may or may not commensurate with the quantity of the evidence."  As such the jurors were required to both consider and weigh the *quality* of the evidence as opposed to the *quantity*.  Hoefle's testimony that the judge's slip of the tongue might have been favorable to Petitioner is buttressed by the fact that the State introduced no new evidence in the mitigation phase; all new evidence in that phase was introduced by Petitioner, so that the word "quantity" might have been heard by the jurors as favoring Petitioner.

        In addition to the conclusion that it was not deficient performance to fail to argue this claim on appeal, the Court concludes that Petitioner was not prejudiced.  To find prejudice, after all, one would have to concluded that the court of appeals would probably have reversed if the claim had been raised.  However, the very court of appeals which had heard the case on direct appeal expressed no doubt on this point.

        Because the Ohio courts' decision on ineffective assistance of appellate counsel was not an unreasonable application of clearly established federal law, this Court defers to it and concludes

23

Petitioner has not established such ineffective assistance.  Absent ineffective assistance of appellate counsel, Petitioner has not excused his procedural default in failing to present this claim on direct appeal.  It is accordingly procedurally defaulted.

**Sixth Ground for Relief**

In his sixth ground for relief Webb asserts that he received ineffective assistance he received from trial counsel when Mr. Hoefle did not object to the jury instruction complained of in the Fifth Claim for Relief. (Petitioner's Post-Hearing Brief, Doc. No. 69, at 24.)  Respondent asserts this claim is procedurally defaulted. (Amended Return of Writ, Doc. No. 42 at 69; Respondent's Post-Hearing Brief, Doc. No. 71, at 17 et seq.)

As this Court stated in its Report and Recommendations on Petitioner's Motion for Partial Summary Judgment, all portions of the claim with the exception of the portion in the fourth ground for relief pertaining to failure to object to the State's argument of a non-statutory aggravating circumstance, were found to be barred by the doctrine of *res judicata* in the state courts on post-conviction relief. (Doc. No. 35 at 56, adopted by the District Court in Order Adopting Report and Recommendations, Doc. No. 36.)  Petitioner acknowledges this, but incorporates by reference is claim of cause and prejudice excusing the procedural default which he made with respect to his Fifth Claim for Relief.

For the reasons set forth above with respect to the Fifth Claim for Relief, the Court finds the Sixth Claim for Relief is also procedurally defaulted.

24

**Seventh Ground for Relief**

In his seventh ground for relief, Webb alleges that the jury which convicted him was improperly constituted, in that Juror Judith Justice was improperly excluded from sitting on the jury. (Second Amended Petition, Doc. No. 41 at 50-51.)  Respondent admits that this claim was raised and rejected on the merits in direct appeal. (Amended Return of Writ, Doc. No. 42 at 70.)  Due to the disposition of the claim in the state courts, this ground has been properly preserved and the Court may address its merits.

During voir dire, "[A] suitable inquiry is permissible in order to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried.  That inquiry is conducted under the supervision of the court, and a great deal must, of necessity, be left to sound discretion." *Mu'min v. Virginia*, 500 U.S. 415 (1991), *quoting Conners v. United States*, 158 U.S. 408 (1895).  In effect the presiding judge acts as a finder of fact even at this point in the trial by reaching conclusions as to impartiality, credibility, bias and prejudices, by relying on their own evaluations of the jurors' demeanor and responses to questions posed by both the court and counsel. *Rosales-Lopezv. United States*, 451 U.S. 182 (1981).

As the United States Supreme Court held in *Witherspoon v. Illinois*, the proper inquiry on voir dire is not whether the prospective juror is opposed to the death penalty, but rather whether their religious, moral, or conscientious objections would preclude them from following the instructions of the court. 391 U.S. 510, 521-522 (1968).  Thus, it is proper to exclude for cause a prospective juror who indicates that either they could not vote for capital punishment under any circumstances or that they would be hesitant to do so. *Morgan v. Illinois*, 504 U.S. 719, 728 (1992); *Lockhart v. McCree*, 504 U.S. 719, 728, (1986) (holding that juror can be removed for cause for a hesitancy to

impose a death sentence); *see also Luckett v. Kemna*, 203 F.3d 1052, 1054-5 (8th Cir. 2000); *see further Gosier v. Welborn*, 175 F.3d 504, 509-10 (7th Cir.); *Keel v. French*, 162 F.3d 263, 271 (4th Cir. 1998).

This Court has reviewed the voir dire in connection with this portion of the claim and the juror in question.  Ms. Justice was questioned by both the judge and counsel.  Her responses on voir dire demonstrate that she would be extremely hesitant to follow the law under the circumstances. While her reasons for her opposition to the death penalty varied from pragmatic reasons – not an effective deterrent and the actual punishment is administered too long after sentence was handed down due to a lengthy appeal process– to a personal event in her past, her view that this previous experience and her general opposition would seriously impair her ability to recommend a death sentence even under appropriate circumstances never wavered.  The Court concludes that the state court decisions affirming her removal for cause are not unreasonable applications of clearly established federal law. *See State v. Webb*, 1993 WL 181988 (Ohio App. 12th Dist**.** 1993).  This claim is therefore without merit.

**Eighth Ground for Relief**

In his eighth ground for relief, Petitioner asserts a claim under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), contending that the prosecutor failed to timely disclose to the defense counsel exculpatory and other material information favorable to the defense regarding: a change in opinion as to the origin of the fire, Tami Webb's alleged sighting of a unidentified individual in red, and potential suspect, Robert Gambrel. (Second Amended Petition, Doc. No. 41 at 56-58.)  Webb claims such prosecutorial misconduct violated his rights to due

process, equal protection, and his right to be free from cruel and unusual punishment.

Respondent argues this claim is procedurally defaulted because it was not raised properly in state court or alternatively, the claim is without merit because there is no *Brady* violation. Portions of the claim were raised in post-conviction relief proceedings. The state courts held that the claims were barred by the doctrine of *res judicata* because they should have been raised on direct appeal and did not depend on evidence outside of the record. In the Report and Recommendations on Petitioner's Motion for Partial Summary Judgment (Doc. No. 35), which has been adopted by the Court (Doc. No. 36), the Court concluded that this Claim was procedurally defaulted.

Petitioner now asserts that he can show excusing cause and prejudice for failure to raise portions of this claim in the state courts, to wit, that the identity of Robert Gambrel as a potential suspect and the possibility that the perpetrator was wearing a red coat were suppressed by the prosecutor until discovered in discovery proceedings in this Court. The Court agrees that to the extent any Brady evidence was suppressed until federal habeas discovery, Petitioner has shown cause for not complaining of that suppression in the state court proceedings. Therefore the Court will address the merits of this claim.

The United States Supreme Court held in *Brady v. Maryland*, 373 U.S. 83 (1963), that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87; *see also Strickler v. Greene*, 527 U.S. 263 (1999) *quoting Kyles v. Whitley*, 514 U.S. 419 (1995)(holding that the *Brady* requirement extends to situations when the evidence is known only to police and imposing a duty on the prosecutor to learn of any favorable evidence known to those acting on the government's behalf.)

27

"The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (the) evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler* at 281-282; *see Jamison v. Collins*, 291 F.3d 380, 385 (6th Cir. 2002).  For prejudice to be established, it must be shown that there is a "reasonable probability" that the trial would have had a different result if the suppressed evidence had been disclosed to the defense. *Strickler* at 289.  A "reasonable probability" is shown when the suppressed evidence "undermines confidence in the outcome of the trial." *Id*. *quoting United States v. Bagley*, 473 U.S. 667, 678 (1985).  To determine the materiality of such evidence "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434; *see also Schledwitz v. United States,* 169 F.3d 1003, 1011-12 (6th Cir. 1999).  A *Brady* violation does not occur if a defendant knew or should have known essential facts permitting him to take advantage of any exculpatory information in his own defense. *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991).

Webb next advances the claim that the State suppressed information that on no less that twelve occasions Tami Webb stated that she had seen an unidentified individual in red peering into her room moments before the explosion. (Second Amended Petition, Doc. No. 41 at 56.)  This claim is fruitless and the idea that the comment was suppressed is without merit.  Tami made this statement at the time of the fire to people at the scene.  She reiterated this claim occasion after occasion.  The fact that it was written in a statement and that she took a polygraph does not change the fact that Petitioner already had the knowledge that Tami claimed to have seen someone wearing a red jacket or sweatshirt in their home on the morning of the fire.  Webb himself testified in the evidentiary

hearing that on the morning of the fire, before the house fire exploded in the home, he went downstairs to check on the girls and Tami, still sitting in her bed told him, "[d]addy I seen somebody in a red shirt that ran out the door, okay?" (Evident. Hrg. May 29, 2003 at 163.)  He could have acted on that knowledge in pursuing his defense.

Webb also claims that additional *Brady* evidence arose out of a police investigation into Robert Gambrel as a possible suspect. (Second Amended Petition, Doc. No. 41 at 57-58.) Webb asserts that the information was material when put in combination with the fact that Gambrel had intimate knowledge of the layout of the home and would have been able to move freely throughout the house quickly and quietly as he located matches and then poured trailers of gasoline from one room to another.  Thus, the information of Gambrel as a possible suspect would have been exculpatory information for Webb's defense.

The investigation into Gambrel commenced after classmate, former girlfriend of Gambrel and rival of Amy Webb, Tracy Jordan, reportedly made a comment that Gambrel had come to school the morning of the fire, smelling of gasoline, without his red letter jacket, and had made the comment that he "hoped it was Amy's house that burnt up." (Evident. Hrg at Exhibit 4.)  Later, when interviewed by Officer Snyder, however, Jordan denied her previous statement that Gambrel had smelled of gasoline, but again stated that he did make the comment. *Id*.

When questioned by police, Gambrel stated that he had said, "I hope it was *not* Amy's house that got burnt up."  Even assuming that Gambrel had made the comment that he hoped it was the Webb residence, this statement is not exculpatory.  It does not show that Gambrel was involved in the arson in any manner whatsoever.  At most, it would show that he would not have suffered regret if it had been her house.  A spoken expression or desire is not the equivalent of striking a match.

29

Finally, it must be noted, that the origin of the comment came from Tracy Jordan, a former girlfriend of Gambrel, who according to Susan Beck, had unsuccessfully feuded with Amy Webb over Gambrel. (Evident. Hrg. May 29, 2003 T.p. at 87.)  Even if the comment were to be considered exculpatory, the source of the report, in combination with the physical evidence linking Webb to the crime, would not have created a reasonable probability that the confidence of the trial would be undercut.

In the same manner, the portion of the police report stating that someone had said that Jordan had originally stated that Gambrel had smelled of gasoline at school the morning of the fire, must also be discounted.  She later denied ever having made that statement.  As she has denied ever making the comment , it cannot be considered exculpatory.  The only purpose that this information may have been useful for would have been for impeachment, but as Tracey Jordan was not called by either party to testify the information could not have been used in such manner.  Therefore, it is not *Brady* material.

Webb further claims that the State failed to disclose information pertaining to the police interest in obtaining Gambrell's red Goshen High School letter jacket. (Second Amended Petition, Doc. No. 41 at 58.)  Webb claims that this information would have been important in his defense of actual innocence as Tami Webb claimed on multiple occasions that on the morning of the fire she saw an unidentified individual in a red jacket or sweatshirt looking into her bedroom. T.p. 476, 480, 485.  Therefore the information that Gambrel owned a red letter jacket may have been used to connect Gambrel to the crime rather than the Petitioner.  Furthermore, at the time of the interview Gambrel claimed that his jacket had been left in a friend's car and that when it was found he would bring it to the police station.  To this day, the jacket remains unaccounted for.

30

This "suppressed evidence," cannot be considered *Brady* material, nor can Gambrell's knowledge of the Webb home.  Evidence does not qualify as *Brady* material if the accused knew or should have known of it. *Clark*, 928 F.2d at 738.  Webb had sufficient knowledge to implicate Gambrel as a suspect at the time of trial.  Gambrel had dated Webb's daughter for a two-year period prior to the fire, and Webb was aware of how much time the boy spent at their home.  Furthermore, he also mentioned in a police interview the conversation he overheard between Amy and Gambrel as she instructed him on how to gain access to the locked basement.  He further knew that Gambrel had a Goshen High School red letter jacket as he stated that Amy often wore it.  It is difficult to imagine that Webb, who has accused a number of people of starting the fire including his own daughter, could overlook a boy who knew the family so well, knew the layout of the home, and who regularly wore a red letter jacket as a potential suspect.  This material is not *Brady* as Webb knew or should have known of the evidence at the time of trial.

The Eighth Ground for Relief should be denied in its entirety.


**Ninth Ground for Relief**

In his ninth ground for relief, Webb is alleging that his conviction is void or voidable because the trial judge was "unaware of the appropriate legal standards." (Second Amended Petition, Doc. No. 41 at 59.)  Webb cites to multiple alleged applications of improper law.  Respondent counters that this claim was brought in the state courts and was held to be barred by *res judicata*, thus the claim is procedurally defaulted. (Amended Return of Writ, Doc. No. 42 at 74.)  In the Report and Recommendations on Petitioner's Motion for Partial Summary Judgment (Doc. No. 35), which has been adopted by the Court (Doc. No. 36), the Court concluded that this Claim was procedurally

defaulted.

**Tenth Ground for Relief**

In his tenth ground for relief, Webb asserts that there was an actual conflict of interest as one of his attorneys during his trial, Gary Rosenhoffer, also represented a witness for the prosecution, Jim Pursifull. (Second Amended Petition, Doc. No. 41 at 64.) Respondent contends that this claim was raised for the first time during post-conviction relief and was held barred by the doctrine of *res judicata*. (Amended Return of Writ, Doc. No. 42 at 75.) In the Report and Recommendations on Petitioner's Motion for Partial Summary Judgment (Doc. No. 35), which has been adopted by the Court (Doc. No. 36), the Court concluded that this Claim was procedurally defaulted.

**Eleventh Ground for Relief**

In his eleventh ground for relief Webb argues that Ohio fails to provide an adequate corrective process for the litigation of post-conviction claims. (Second Amended Petition, Doc. No. 41 at 65.) Respondent argues that this claim is not cognizable under 28 U.S.C. § 2254, as post-conviction proceedings are collateral in nature. (Amended Return of Writ, Doc. No. 42 at 76.)

The Court agrees with Respondent that federal habeas corpus is not the proper place to bring forth challenges to a state's scheme of post-conviction relief. *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986). When a prisoner challenges errors or deficiencies in state post-conviction proceedings such claims address collateral matters rather than the underlying state conviction giving rise to the prisoner's incarceration. *Id.* at 247. Any challenges or amendments to the interpretation of Ohio's appellate and post-conviction remedies belongs with the highest judicial tribunal of Ohio, not with

this Court. *Keener v. Ridenour*, 594 F.2d 581, 590 (6th Cir. 1979).  Furthermore, the Supreme Court of the United States has held that there is no obligation on the part of the states to provide post-conviction relief remedies. *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987); *United States v. MacCollom*, 426 U.S. 317, 323 (1976).  As such, the claim is not cognizable under U.S.C. § 2254 as there is not a federal constitutional violation.


**Twelfth Ground for Relief**

Webb's twelfth ground for relief alleges that the State of Ohio, through the State Public Defender's office, impeded the defense of the case through inadequate investigation. (Second Amended Petition, Doc. No. 41 at 66-7.)  Respondent counters that the claim is procedurally defaulted and in the alternative, this claim is a collateral attack on the Ohio State Public Defender system and is not cognizable in federal habeas corpus. (Amended Return of Writ, Doc. No. 42 at 76.) In the Report and Recommendations on Petitioner's Motion for Partial Summary Judgment (Doc. No. 35), which has been adopted by the Court (Doc. No. 36), the Court concluded that this Claim was procedurally defaulted.


**Thirteenth Ground for Relief**

Webb, next alleges in this thirteenth ground for relief, that his conviction and sentence are void or voidable because of the cumulative effects of the errors and omissions. (Second Amended Petition, Doc. No. 41 p.68.)  Respondent answered by stating that this claim was properly dealt with by the Ohio Supreme Court in that it was found that there were two harmless errors and even when combined these errors did not deprive Webb of a fundamentally fair trial. (Amended Return of Writ,

Doc. No. 42 p. 77.)  Respondent further states the this decision was not contrary to nor an unreasonable application of clearly established federal law. *Id.* As Respondent did not raise the affirmative defense of procedural default, this Court may address the claim on the merits.

This Court rejects the notion that multiple non-meritorious claims can be combined into a "cumulative effect" claim.  As none of the individual acts of alleged errors or omissions have risen to the level of depriving the Petitioner of a fundamentally fair trial, this Court recommends that the thirteenth ground for relief be denied on the merits.

**Fourteenth Ground for Relief**

In his fourteenth ground for relief, Webb asserts that the Ohio death penalty scheme is unconstitutional and because of this unconstitutionality the trial court erred in denying his motion to dismiss the specifications and further erred by imposing a death sentence. (Second Amended Petition, Doc. No. 41 at 69.)  Webb supports this claim with numerous sub-claims including: the death penalty is imposed in an arbitrary and capricious manner; aggravating circumstances are presented in the guilt phase rather than the punishment phase which prohibits an individualized determination; and the statute foreclosed the sentencer's ability to grant mercy based on mitigation evidence.

Respondent counters that this claim was raised on direct appeal and that the Ohio Supreme Court dealt with it in a reasonable and correct manner. (Amended Return of Writ, Doc. No. 42 at 78.)  Because the supreme court addressed the claim on the merits, this Court may do so now.

Webb first challenges the constitutionality of the Ohio death penalty statutes by asserting that the state permits the death penalty to be administered in an arbitrary, capricious, and discriminatory

34

manner. (Second Amended Petition, Doc. No. 41 at 69.) That claim has been rejected by the Sixth

Circuit Court of Appeals in a previous case. *Buell v. Mitchell*, 274 F.3d 337, 367 (6th Cir. 2001).

Webb next argues that no "narrowing effect" occurred as the jury was instructed to consider

all evidence it deemed relevant. (Second Amended Petition, Doc. No. 41 at 70.) To be

constitutional, a capital sentencing scheme must "genuinely narrow the class of persons eligible for

the death penalty and must reasonably justify the imposition of a more severe sentence on the

defendant compared to others found guilty of murder." *Lowenfield v. Phelps*, 484 U.S. 231 (1988)

*quoting Zant v. Stevens*, 462 U.S. 862, 877 (1983). Under the Ohio capital sentencing scheme, the

jury is required to find at least one aggravating circumstance before imposing a death sentence,

creating a narrowing of the class of persons that may be eligible for the sentence. Webb further

contends that the Ohio death penalty statutes are unconstitutional because they permit the sentencing

body to consider aggravating circumstances at the trial level. That argument has been rejected by

this Court in *Zuern v. Tate*, 101 F. Supp. 2d 948, 1003-04 (S.D. Ohio 2000), on the authority of

*Tuilaepa v. California*, 512 U.S. 967, 971-72 (1994).

Petitioner next argues that Ohio's death penalty is unconstitutional because it does not permit

the jurors to consider sympathy or mercy for the defendant. (Second Amended Habeas Petition, Doc.

41 at 71.) The Supreme Court has held that "the sentencer must **rationally** distinguish between those

individuals for whom death is an appropriate sanction and those for whom it is not." *Spaziano v.

Florida*, 468 U.S. 447, 460 (1984). The jury must of course listen sympathetically to the mitigating

evidence. That is, they are required to accept as mitigating those factors which the Supreme Court

has held are proper to be considered in mitigation. But they may not exercise general sympathy.

This is to ensure that the death penalty is not administered in an arbitrary and unpredictable manner.

*Gregg v. Georgia*, 428 U.S. 153 (1976); *Furman v. Georgia*, 408 U.S. 238 (1972).  A capital defendant is not entitled to a "merciful discretion" instruction.  In fact, an instruction to a death sentence jury that it may disregard statutory criteria may be constitutionally impermissible under *California v. Brown*, 479 U.S. 538, 541, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987). The claim that the standard instruction to disregard sympathy is unconstitutional was rejected on the basis of *California v. Brown* in *Depew v. Anderson*, C-1-94-459 Report and Recommendations of June 8, 1999, adopted 104 F. Supp. 2d 879 (S.D. Ohio 2000), *aff'd*, 311 F.3d 742 (6th Cir. 2002).  *Accord, Byrd v. Collins*, 209 F. 3d 486 (6th Cir. 2000); *Mapes v. Coyle*, 171 F. 3d 408, 414-15 (6th Cir. 1999); *Scott v. Mitchell*, 209 F. 3d 854 (6th Cir. 2000).  This claim is without merit.

**Fifteenth Ground for Relief**

In his fifteenth ground for relief, Webb asserts that a new evidentiary rule was applied *ex post facto*, lessening the burden needed to find Petitioner guilty and disadvantaging his defense. (Second Amended Petition, Doc. No. 41 at 72.)  Respondent, in turn, admits that this claim was addressed on its merits by the Ohio Supreme Court.  Therefore, it is proper for this Court to address the merits of the claim.

Constitutional violation results from *ex post facto* laws only applies when penal statutes disadvantage the offender affected by them. *Collins v. Youngblood*, 497 U.S. 37 (1990) *citing Calder v. Bull*, 3 U.S. 386 (1798); *Miller v. Florida*, 482 U.S. 423 (1987).  The *Ex Post Facto* Clause is implicated in certain situations:

> Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action . . . . every law that *aggravates a crime*, or makes it *greater* than it was, when committed . . . . every law that *changes the*

36

> *punishment*, and inflicts a greater punishment, than the law annexed
> to the crime, when committed . . . . every law that alters the *legal*
> rules of *evidence*, and received less, or different, testimony, than the
> law required at the time of the commission of the offence, *in order to
> convict the offender*. (Emphasis in original)

*Youngblood*, 497 U.S. at 42 *citing Calder*, 3 U.S. at 390.  The Clause does not extend to procedural changes-those by which a criminal case is adjudicated- including changes in the applications of new evidentiary rules in trials for crimes committed prior to such changes. *Thompson v. Missouri*, 171 U.S. 380, 386-387 (1898).  Procedural changes are only prohibited by *ex post facto* if they "affect[s] matters of substance, by depriving a defendant of substantial protections with which the existing law surrounds the person accused of crime" . . . . arbitrarily infringing upon "substantial personal rights."" *Youngblood*, 497 U.S. at 45 *citing Duncan v. Missouri*, 152 U.S. 377 (1894); *Malloy v. South Carolina*, 237 U.S. 180 (1915).

In Webb's situation the court of appeals and state supreme court applied the new rule adopted in *State v. Jenks*, 61 Ohio St. 3d 259, 574 N.E. 2d 492 (1991)*,* to the effect that "evidence whether circumstantial or direct, is sufficient if a rational fact-finder could find all essential elements proven beyond a reasonable doubt" as opposed to the prior Ohio law enunciated in *State v. Kulig*, 37 Ohio St. 2d 157, 309 N.E. 2d 897 (1974), which had been applied in the trial court, to the effect that "circumstantial evidence, to support a finding of guilt, must be consistent only with guilt, and inconsistent with any reasonable theory of innocence." (Second Amended Petition, Doc. No. 41 at 72-3).  The Ohio Supreme Court rejected Webb's argument that this had a prohibited *ex post facto* effect as follows:

> Jones involved a statute giving the defense the burden of persuasion
> as to affirmative defenses, where before it had had only the burden of
> going forward; thus, the new statute "decrease[d] the quantum of

37

proof required for criminal conviction." 67 Ohio St. 2d at 249, 21 Ohio Op. 3d at 155, 423 N.E.2d at 450.  We noted that *Calder v. Bull* (1798), 3 U.S. (3 Dall.) 386, 1 L. Ed. 648, had defined "*ex post facto laws*" to include "'[e]very law that alters the *legal* rules of *evidence*, and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender.*' (Emphasis sic.)" *Jones*, 67 Ohio St. 2d at 248, 21 Ohio Op. 3d at 155, 423 N. E. 2d at 449, *quoting Calder*, 3 U.S. at 390, 1 L. Ed. At 650.  By imposing a new burden on defendants, the statute allowed conviction on less testimony than required at the time of the offense; it was thus *ex post facto* as to crimes committed before it took effect.

However, *Jones* is fatally undercut by *Collins v. Youngblood* (1990), 497 U.S. 37, 110 S. Ct. 2715, 111 L. Ed. 2d 30. *Citing Beazell v, Ohio* (1925), 269 U.S. 167, 46 S. Ct. 68, 70 L. Ed. 216, *Collins* summarized the *Ex Post Facto* Clause as follows: "Legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts." 497 U.S. at 41, 110 S.Ct. at 2719, III L. Ed. 2d at 39. *Collins* specifically noted that *Beazell* definition omits the reference * * * to alterations in the 'legal rules of evidence.' * * * This language was not intended to prohibit the application of new evidentiary rules in trials for crimes committed before the changes." *Collins*, 497 U.S. at 43, 110 S. Ct. at 2719, 111 L. Ed. 2d at 39, fn. 3.

Retroactive application of *Jenks* "does not punish as a crime an act previously committed, which was innocent when done; nor make more burdensome the punishment for a crime, after its commission; nor deprive one charged with crime of any defense available according to law at the time when the act was committed." *Collins*, 497 U.S. at 52, 110 S. Ct. at 2724, 111 L. Ed. 2d at 45.  *Jenks* changed only the "evidentiary standard," *Jones*, 67 Ohio St. 2d at 248, 21 Ohio Op. 3d at 155, 423 N.E. 2d at 449, and *Collins* establishes that new evidentiary rules may be applied retroactively. Therefore, a rule changing the quantum of proof required for conviction may be applied to trials of crimes committed before the rule was announced, without violating the *Ex Post Facto* Clause.  To the extent *Jones* holds the contrary, we overrule it.

*State v. Webb*, 70 Ohio St. 3d 325, 330-332, 638 N.E. 2d 1023, 1029-1030 (1994).

38

Petitioner offers no argument to demonstrate this decision of the state court is contrary to or an unreasonable application of clearly established federal law.  Thus, this claim is without merit.

## Conclusion

In accordance with the foregoing analysis, it is respectfully recommended that the Second Amended Petition for Writ of Habeas Corpus be dismissed with prejudice on the merits.

March 4, 2005.

s/ **Michael R. Merz**
Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within ten days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).

40