# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

MICHAEL WEBB,
:
    Petitioner,                             Case No. 1:98-cv-766

:         District Judge Susan J. Dlott
   - v -                                Chief Magistrate Judge Michael R. Merz

BETTY MITCHELL, Warden      :

    Respondent.

---

**SUPPLEMENTAL REPORT AND RECOMMENDATIONS**

---

      This capital habeas corpus case is before the Court on Petitioner Michael D. Webb's Objections ("Petitioner's Objections," Doc. No. 79) to the Magistrate Judge's Report and Recommendations (Report and Recommendations, Doc. No. 74) and Respondent's Response thereto ("Response," Doc. No. 82). The General Order of Reference for the Dayton location of court permits the Magistrate Judge to reconsider decisions or reports and recommendations when objections are filed.

      The Magistrate Judge recommended that the Second Amended Petition be denied on the merits as to all claims for relief. Petitioner raises no objections to the Magistrate Judge's proposed disposition of the Third, Seventh, Ninth, Eleventh, Thirteenth, and Fourteenth Claims for Relief[1] and

---

[1] The Objections are inconsistent as to which Claims for Relief have become uncontested. Initially (p. 5), the Objections state "[p]etitioner does not object to the Report and Recommendation's disposition of the Third, Seventh, Ninth, Eleventh, Thirteenth, and Fourteenth Claims for Relief." At page 9 Petitioner states he "does not object to the Report and Recommendation's disposition of the Ninth, Eleventh, Thirteenth, and Fourteenth claims for relief." No argument is actually made as to the Third and Seventh Claims for Relief.

1

the Report may thus be adopted as to those claims without further recommendation.

**Objection A: First and Fourth Claims for Relief were incorrectly found to have been procedurally defaulted and are meritorious (Objections, Doc. No. 79, at 12).**

In his first and fourth claims for relief, Webb argued various instances of prosecutorial misconduct during the opening statement, presentation of evidence, and the final argument phases of the guilt portion of his trial. (Second Amended Petition, Doc. No. 41 at 5, 32.) The Magistrate Judge recommended that both grounds be denied based on the doctrine of procedural default. (Report and Recommendations, Doc. No. 74 at 16-17; 18-19) based upon the earlier Report and Recommendations On Petitioner's Motion for Partial Summery Judgment ("Report and Recommendations on SJ," Doc. No. 35 at 46-53) which District Judge Dlott adopted.

Webb now objects, arguing that all sub-claims, except the one dealing with non-statutory aggravating circumstances, were properly presented and preserved during direct appeal. (Petitioner's Objections, Doc. No. 79 at 12-13.) Petitioner notes the conclusion in the prior R&R which held that certain sub-claims were properly preserved (Doc. No. 35 at 47-48).

Petitioner is correct and the Report and Recommendations are in error as to Claims 1 and 4. The sub-claims pertaining to prosecutorial misconduct based on allegations of 1) comments on the Petitioner's failure to testify, 2) taunting of the Petitioner, and 3) adducing evidence of the bad character of the defendant, have been preserved for review[2] and the following analysis is substituted

---

[2] Respondent concedes that several of the sub-claims in the first ground for relief were preserved including; improper opinion testimony, use of grand jury testimony, use of character evidence, calling Tami Webb as a witness for the trial court, questioning of Tami Webb, alleged comment on the right to remain silent, and the assistant prosecutor's "taunting" of Webb. (Response, Doc. No. 82 at 8.) As Petitioner has only argued a few of these, the Court presumes the other claims have been waived and will only address those argued in his Objections to the Report and Recommendations. Furthermore, this Court has not been able to find in Petitioner's First or Fourth Grounds for relief, the sub-claims of prosecutorial misconduct relating to a non-capital plea bargain or the

for what was previously written on these Claims.

Petitioner argues prosecutorial misconduct based on a violation of the right to remain silent. The Fifth amendment safeguards that "no person . . . shall be compelled in any criminal case to be a witness against himself . . ." Neither a prosecutor nor a trial judge may comment upon a criminal defendant's failure to testify. *Griffin v. California*, 380 U.S. 609 (1965). This rule applies to both direct and indirect comments on the failure to testify. *Raper v. Mintzes*, 706 F.2d 161 (6th Cir. 1983); *Chapman v. California*, 386 U.S. 18 (1967); *Eberhardt v. Bordenkircher*, 605 F.2d 275 (6th Cir. 1979). In the instance of a direct comment the court must reverse the conviction unless the prosecution can demonstrate that the error was harmless beyond a reasonable doubt. *Raper*, 706 F.2d 161. However, cases that involve indirect comments are more difficult to decipher. The court must probe and analyze the context of the comment. General comments concerning uncontradicted evidence may not reflect defendant's failure to testify where witnesses other than the defendant could have repudiated the evidence. *Id.*; *United States v. Thurmond*, 541 F.2d 774 (8th Cir. 1976).

Such comments are more objectionable when the defendant is the only person who could possibly contradict the evidence in question. *Raper,* 706 F.2d 161; *United States v. Robinson*, 651 F.2d 1188, 1197 (6th Cir. 1981). The Sixth Circuit, however, has refused to adopt a *per se* rule mandating reversal as a result of an indirect comment. *Butler v. Rose*, 686 F.2d 1163, 1170 (6th Cir. 1982). Rather the court must analyze and consider the comment in terms of four factors; 1) were the comments 'manifestly intended' to reflect on the accused's silence or of such character that the jury would 'naturally and necessarily' take them as such, 2) were the remarks isolated or extensive, 3) was the evidence of guilt otherwise overwhelming, and 4) what curative instructions were given

---

aggravating circumstances of terror and horror felt by the victims.

and when. *Hearn v. Mintzes*, 708 F.2d 1072, 1077 (6th Cir. 1983). "Manifest intent will not be found 'if some other explanation for his remark is equally plausible.'" *United States v. Robinson*, 651 F.2d 1188, 1197 (6th Cir. 1981).

Here Webb argues only that "the prosecutor improperly commented on Petitioner's right to remain silent or erroneously placed a burden on the defense to present evidence" and that the Prosecutor taunted him into speaking. (Second Amended Petition, Doc. No. 41 at 17.) He cites to numerous places in the transcript as support for his claim, though he does not inform the Court as to the actual disputed comment contained therein. The Court is left to guess which statements made by the prosecutor Petitioner may have found objectionable in support of his claim. *Id*; *see* T.p. 1368 ("$12,000 off the top, in one day, no explanation what happened to it."); 1372 ("He's taken $20,000 out of here and this is by June of the same year, no explanation." "Through 9-30-89 he's down to $682, no explanation, nobody knows that it's gone."); 1375 ("If he says well, it kind of changed after September 1st '84, well, if he would have accounted for it he would have known that."); 1385 ("Susan testified that Mike knew about the insurance. She said well, he didn't know how much. Well, I don't know whether that's good or bad for the defendant. Did he believe there was much more, or did he believe there was less?"); 1386 ("Well, what's the truth? You heard Nadine's testimony, and I haven't heard any rebuttal from Nadine's testimony, and what she said was she was in love with this man . . . [a]gain, that's not rebutted, but there's more than just that."); 1387 ("That is just not a friendship card. She indicated the defendant never told her that she was out of line presenting that card, that certainly conformed to his feelings. He didn't think that was a problem."); 1388 (". . . timing of it, the cancellation of the rental even though he was aware of the reason why, I don't care what he says afterward, he knew what the situation was before November 1st."); 1396

("two separate occasions the defendant met him and lied to him, and this is uncontradicted. He told him "I'm going to the hospital to have colon cancer surgery." You will see in his hospital records clearly it indicates he was in good health before the fire, had no problems. This is uncontradicted . . . Pursifal's comments are unrebutted that the defendant told him he had the serious colon cancer and he had to come back and work behind the defendant's house, help him keep caught up."); 1399 ("Now of course the defendant by his plea of not guilty says an outsider is responsible."); 1400 ("You may or may not like the State's motive. There's a lot of it, and assuming you don't like the State's motive, where is any evidence that anyone else, to wit, an outsider, had any motive whatsoever to kill anyone, much less a three-and-a-half year old boy? Where is the motive to do that? Whoever did this intended for them to die. Where is anyone's motive, except the defendant, of course."); 1410 ("We've got two of these containers. Where do they come from? Who knows. There's no evidence of where they come from . . . . Now, I don't know if those containers came from that house or not. I assume the defense will argue that they did, to explain the defendant's fingerprints."); 1419 ("The defendant's story not the morning of the fire, but after he had time to think about it, at least for a day or so, was that he was right there, reaching for that doorknob, and the fire went off and blew him into the bathroom."); 1506-1508 ("Well, let's talk about some of the things he didn't talk about. First off, he said he didn't give any explanation at all as to, first off, the matches in the bathroom. Did he say one single word about the matches in the bathroom commode? Did [sic] say that Amy put them there? Did he say that Amy could have put them there? Did he say that Tami could have put them there? Did he say that Susan could have put them there? He didn't say that. He totally and completely ignored that fact and the reason he ignored it was because the Defendant was in the bathroom and he knows it and he was trapped there. He had no choice so he

5

ignored it and hoped that possibly you would ignore it.  The Defendant's blood on the back door he said nothing about that.  Not a single word about the Defendant's blood on the back of the door.  In fact, there has not been one single explanation throughout this trial as to how it got there . . . . There has never been an explanation as to how blood got on the back door.  There has never been an adequate explanation as to how blood got on the lower level door.  There has never been any explanation as to how the blood got on the matches . . . . It's unrebutted as to the location of the matches.  So, when you think about the fact that Mr. Chapman failed to comment on that.  He failed to point out the fact that those matches are evidence that he couldn't use to blame Amy or to blame Tami."); 1508 (Mr. White: "That man right there in that chair killed his son.  That man right there in that chair tried to kill every single person in his house."  Mr. Webb: "You're wrong."  Mr. White: "He spoke.")

      In the above examples, the comments were directed toward the strength of the evidence presented by the defense as opposed to defendant's assertion of his right not to testify.  The prosecutor was highlighting portions of uncontradicted evidence, or contradictions in the evidence as it was presented.  The comments were not "manifestly" intended to reflect Webb's silence.  Even the final comment, in which Webb interjected and the Prosecutor replied that "he spoke" was a comment on the action of Webb's speaking and interjecting in closing argument, rather that a comment on his refusal to take the stand.  Furthermore, this Court cannot conclude that the jury took the comments to be a reflection on Petitioner's silence.  Rather this Court believes that the jury would probably have assumed that the comments went to the contradictions and lack of explanation in the defense's argument and evidence.

      Furthermore, even assuming that the remarks were comments on Webb's failure to testify,

6

he cannot meet the remainder of the prongs in the test. While the comments above look extensive, in proportion to the 1500 plus pages of transcript, the comments are not prevalent but were rather isolated to closing argument. Secondly, the evidence of guilt is overwhelming in this case. Third, it must be noted that the trial court instructed the jury that opening and closing statements by the parties were not evidence and were not to be taken into consideration during deliberations. T.p. Vol. XVI at 1513-4. Finally, the jurors were given instructions that Webb's silence was a constitutional right and no indication of guilt. *Id.* at 1519. Therefore, under the analysis of *Hearn v. Mintzes,* comments made by the State in closing were not of such a nature as to require reversal under United States Supreme Court law. 708 F.2d 1072, 1077 (6th Cir. 1983); *Griffin v. California*, 380 U.S. 609 (1965). The sub-claim for prosecutorial misconduct based on comments directed at Petitioner's silence is without merit. In addition, since the Ohio Supreme Court reached this claim on the merits, it is subject to deferential review under the AEDPA, 28 U.S.C. §2254(d). The Ohio Supreme Court applied federal law in deciding the question and its decision is not an objectively unreasonable application of that law.

Next the Court turns to the merits of the sub-claim pertaining to the admission of character evidence. Webb makes multiple accusations of instances in which the State elicited or commented on character evidence. (Second Amended Petition, Doc. No. 41 at 5, 7, 8, 10, 11, 14, 15, 16, 17, 18.)

Petitioner raised this claim as his Sixteenth Proposition of law in the Ohio Supreme Court. That Court held that none of the allegedly improper character evidence was used for an improper purpose. The testimony about Webb's character elicited from Tami Webb was used to discredit her own prior testimony in favor of her father. The character evidence elicited from Nadine Puckett, Larry Beck, Diane Green, and James Pursifull was being used for the permissible purpose of

7

showing motive, absence of mistake or accident, preparation, or plan. Character evidence from Tami Webb and Susan Beck was used, however, not to show that the Petitioner acted in conformity with any particular character trait on this particular occasion, but rather to impeach the witnesses with conflicting prior statements and revealing possible bias on the part of those testifying. Petitioner's Objections neither suggest why these might be incorrect rulings under Ohio evidence law or how they could violate the United States Constitution. They do not involve any prosecutorial misconduct.

In his next sub-claim, Webb contends that the State improperly attacked his character even though it was never placed in issue and additionally violated his Fifth Amendment right against self-incrimination when the prosecutor commented on defendant's silence. (Second Amended Petition, Doc. No. 41 at 17.) Petitioner fails to make a showing as to how any comment on character may have deprived him of a fundamentally fair trial and infringed on his federal rights. Without such showing, this Court cannot find that there was prosecutorial misconduct.

These sub-claims are without merit and the decisions of the State courts were neither unreasonable nor contrary to federal law.

For reasons previously set forth in the Report and Recommendations on Petitioner's Motion for Partial Summary Judgment, Petitioner's additional arguments pertaining to other sub-claims are without merit. (Report and Recommendations on SJ, Doc. No. 35 at 46-53; 55.)

**Objection B: The Second, Sixth, Tenth, and Twelfth Claims for Relief are not procedurally defaulted (Objections, Doc. No. 79, at 13).**

Next Petitioner objects to the Court's findings of procedural default in his Second, Sixth, Tenth, and Twelfth grounds for relief. (Petitioner's Objections, Doc. No. 79 at 13-16; 27-32.) Petitioner argues that the Ohio courts incorrectly relied on *res judicata* to bar these claims. He further argues that a habeas court may review the claim when the lower court applies *res judicata* erroneously. *Id*.

This objection is grossly untimely. The Magistrate Judge reached his conclusion that these Claims for Relief were procedurally defaulted when he filed his Report and Recommendations on the Motion for Partial Summary Judgment on December 26, 2000 (Doc. No. 35). Petitioner had the standard opportunity to present objections at that time and failed to do so. When Petitioner failed to object, District Judge Dlott adopted the Report and Recommendations. Thus the conclusion that these claims were procedurally default became the law of this case more than four years ago. All of the arguments which Petitioner now makes on this procedural default point were available to him then. He has offered no good cause for reopening this question.

**Objection C: Petitioner has established ineffective assistance of appellate counsel sufficient to excuse his procedural default of his Fifth Claim for Relief (Objections, Doc. No. 79, at 18).**

In his fifth ground for relief, Petitioner argues that the trial court improperly instructed the jury as to the burden of proof in the mitigation phase. (Second Amended Petition, Doc. No. 41 at 33);(Petitioner's Objections, Doc. No. 79 at 18-26.) This Court ruled that the claim was procedurally defaulted as it was not raised on direct appeal. (Report and Recommendation, Doc. No.

74 at 19-25); (Report and Recommendations on SJ, Doc. No. 35 at 56.)  Webb attempted to overcome this ruling by arguing ineffective assistance of counsel of appellate counsel as his cause for failing to raise this claim at the proper time.  This Court held that "because the Ohio courts' decision on ineffective assistance of appellate counsel was not an unreasonable application of clearly established federal law, this Court defers to it and concludes Petitioner has not established such ineffective assistance.  Absent ineffective assistance of appellate counsel, Petitioner has not excused his procedural default in failing to present this claim on direct appeal.  It is accordingly procedurally defaulted." (Report and Recommendation, Doc. No. 74 at 24-25.)

Petitioner's argument merely duplicates previously-made arguments and as a consequence, no further analysis is required beyond that set forth in the original Report and Recommendations and the Report and Recommendations on Petitioner's Motion for Partial Summary Judgment. (Doc. No. 74); (Doc. No. 35.)

**Objection D:  Petitioner has established ineffective assistance of appellate counsel sufficient to excuse his procedural default of his Fifth Claim for Relief (Objections, Doc. No. 79, at 27).**

The analysis offered with respect to the Fifth Claim for Relief applies equally to this claim.

**Objection E: Petitioner's Eighth Claim for Relief under *Brady v. Maryland* has merit.**

In his eighth ground for relief Webb argued that the State engaged in misconduct when they failed to disclose material exculpatory evidence. (Second Amended Petition, Doc. No. 41 at 56-58.) This Court held that the evidence did not fall under  as Webb should have known of this evidence at trial. (Report and Recommendations, Doc. No. 74 at 27-32.)  In his objections Webb argues that

10

the Court's decision was erroneous because he did not know nor should he have known that Robert Gambrell was a suspect in this case. (Petitioner's Objections, Doc. No. 79 at 33-51.)

Again, Petitioner's argument merely duplicates previously-made arguments and as a consequence, no further analysis is required beyond that set forth in the original Report and Recommendations and in the Report and Recommendations on Petitioner's Motion for Summary Judgment. (Doc. No. 74 at 27-32); (Doc. No. 35 at 57-58.)

**Objection F: The Magistrate Judge erred by not considering the Fifteenth Claim for Relief under the Due Process and Equal Protection Clauses, but only under the *Ex Post Facto Clause*.**

Petitioner's Fifteenth Claim for Relief reads as follows:

> Petitioner's conviction and sentence are void or voidable because Ohio retroactively applied a new rule, during appellate review, changing the quantum of proof required for conviction and altering the defense relied upon at trial that "circumstantial evidence used to prove an element of a crime must be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilty," in violation of the ex post facto prohibition contained in Article I, §10 and Due Process guarantees as incorporated in the Fifth and Fourteenth Amendments to the United States Constitution.

(Second Amended Petition, Doc. No. 41, at 72).

The sole argument before the Court on this Claim for Relief at the time of the Report and Recommendations was the completely conclusory argument in the Second Amended Petition itself; the Second Amended Petition cites only one case, *Collins v. Youngblood*, 497 U.S. 37 (1990). There is no mention in the Second Amended Petition of the Equal Protection Clause. This Claim for Relief was not argued at all in Petitioner's Post-Hearing Brief, presumably because it had not been subject of any evidence presented, although the Court did not limit briefing to those issues.

11

In the Report and Recommendations, the Magistrate Judge noted that the Ohio Supreme Court had dealt with this claim on the merits and concluded that the state court's decision was not an unreasonable application of clearly established Supreme Court law.

In his Objections, Petitioner appears to accept what was written in the Report and Recommendations about the *Ex Post Facto* Clause, but asserts "[t]he Report & Recommendation fails to consider whether the Due Process implications of such a change in the law render the Ohio Supreme Court decision contrary to or an unreasonable application of clearly established federal law." (Objections, Doc. No. 79, at 51).

Petitioner begins his argument on this Objection by stating:

> The record is clear that in addition to Ex Post Facto issues, Webb also argued in the Ohio Supreme Court that the change in the quantum of proof also violated Due Process and Equal Protection Clauses of the federal Constitution. See, Appendix to Return of Writ, Ex. K[3], p. 82.

(Objections, Doc. No. 79, at 51.)

The Ohio Supreme Court decision says nothing about any equal protection analysis and because no such claim is pled in the Second Amended Petition, Petitioner's objection about omitting any equal protection analysis is not well taken.

With respect to due process, in denying Webb's Propositions of Law 22 and 23, the Ohio Supreme Court did recognize that the United States Supreme Court States has applied *ex post facto* principles to judicial decisionmaking. At footnote 1 of its decision, it wrote:

> Though the *Ex Post Facto* Clause "does not of its own force apply to the Judicial Branch," *Marks v. United States* (1977), 430 U.S. 188, 191, 97 S.Ct. 990, 992, 51 L.Ed.2d 260, 265, due process places similar constraints on a court's power to apply precedent to cases arising before the precedent

---

[3]The reference should be to page 82 of Exhibit **J**, Petitioner's Brief in the Ohio Supreme Court; Exhibit K is the Appendix to that Brief.

>was announced.  See *Bouie v. Columbia* (1964), 378 U.S. 347, 353-354, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894, 900.

*State v. Webb*, 70 Ohio St. 3d 325, 330 638 N.E. 2d 1023, 1029 (1994)

The sole case Petitioner relied on in the Second Amended Petition is *Collins v. Youngblood*. That is also the principal case relied on by the Ohio Supreme Court.  In *Collins,* decided in 1990, the United States Supreme Court substantially reformed its *Ex Post Facto* Clause analysis, holding that procedural reforms which are applied to crimes committed before their enactment do not violate the *Ex Post Facto* Clause. In *Collins* itself, the Court upheld a statute which permitted an appellate court to reform a verdict when the verdict in question would have been void at the time it was returned.  The Court engaged in a lengthy historical analysis of its cases and concluded that some prior decisions (e.g., finding an *ex post facto* violation in reducing the size of a jury) were not proper under a correct understanding of the Clause.

The Ohio Supreme Court's analysis of *Collins v. Youngblood's* application to this case is as follows:

>Citing *Beazell v. Ohio* (1925), 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216, *Collins* summarized the Ex Post Facto Clause as follows: "Legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts." 497 U.S. at 43, 110 S.Ct. at 2719, 111 L.Ed.2d at 39. *Collins* specifically noted that "[t]he *Beazell* definition omits the reference * * * to alterations in the 'legal rules of evidence.' * * * [T]his language was not intended to prohibit the application of new evidentiary rules in trials for crimes committed before the changes." *Collins*, 497 U.S. at 43, 110 S.Ct. at 2719, 111 L.Ed.2d at 39, fn. 3.
>
>Retroactive application of *Jenks* [to this case] "does not punish as a crime an act previously committed, which was innocent when done; nor make more burdensome the punishment for a crime, after its commission;  nor deprive one charged with crime of any defense available according to law at the time when the act was committed." *Collins*, 497 U.S. at 52, 110 S.Ct. at 2724, 111 L.Ed.2d at 45.  *Jenks*

13

> changed only the "evidentiary standard," *Jones*, 67 Ohio St.2d at 248, 21 O.O.3d at 155, 423 N.E.2d at 449, and Collins establishes that new evidentiary rules may be applied retroactively. Therefore, a rule changing the quantum of proof required for conviction may be applied to trials of crimes committed before the rule was announced, without violating the Ex Post Facto Clause.

*State v. Webb*, 70 Ohio St. 3d at 331.

In order to prevail on his Fifteenth Ground for Relief, Petitioner must prove that this is an objectively unreasonable application of clearly established federal law. To do so he relies on two Supreme Court cases, *Bouie v. City of Columbia*, 378 U.S. 347 (1964), and *Rogers v. Tennessee*, 532 U.S. 451 (2001).

In *Bouie*, the South Carolina Supreme Court had interpreted a trespassing statute as not requiring prior notice to trespassers as an element of the offense, whereas its consistent prior interpretation had required such notice. The U.S. Supreme Court had held that such judicial elimination of an element of the crime violated *ex post facto* concepts as applied to judicial decisionmaking through the Due Process Clause. In *Rogers*, the defendant had been convicted of murder although it took more than a year for the victim to die after being wounded. The Tennessee Supreme Court had acknowledged that the year-and-a-day rule as a limitation on murder convictions had been a part of the common law, but found it was no longer a part of Tennessee law and upheld the conviction. On appeal to the U.S. Supreme Court, the defendant contended *Bouie* required reversal because a long-standing element of the offense had been retroactively eliminated in his case on appeal.

Justice O'Connor acknowledged that some of the dicta in *Bouie* could be read to apply. However, she said,

> To the extent petitioner argues that the Due Process Clause

14

incorporates the specific prohibitions of the Ex Post Facto Clause as identified in *Calder*, petitioner misreads *Bouie*. To be sure, our opinion in *Bouie* does contain some expansive language that is suggestive of the broad interpretation for which petitioner argues. Most prominent is our statement that "if a state legislature is barred by the Ex Post Facto Clause from passing . . . a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction." 378 U.S. at 353-354; see also id. at 353 ("An unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law"); id. at 362 ("The Due Process Clause compels the same result" as would the constitutional proscription against ex post facto laws "where the State has sought to achieve precisely the same [impermissible] effect by judicial construction of the statute"). This language, however, was dicta. Our decision in *Bouie* was rooted firmly in well established notions of due process. See supra, at 5. Its rationale rested on core due process concepts of notice, foreseeability, and, in particular, the right to fair warning as those concepts bear on the constitutionality of attaching criminal penalties to what previously had been innocent conduct. See, e.g., 378 U.S. at 351, 352, 354, 354-355. And we couched its holding squarely in terms of that established due process right, and not in terms of the ex post facto-related dicta to which petitioner points. Id. at 355 (concluding that "the South Carolina Code did not give [the petitioners] fair warning, at the time of their conduct . . .,that the act for which they now stand convicted was rendered criminal by the statute"). Contrary to petitioner's suggestion, nowhere in the opinion did we go so far as to incorporate jot-for-jot the specific categories of Calder into due process limitations on the retroactive application of judicial decisions.

Nor have any of our subsequent decisions addressing *Bouie*-type claims interpreted *Bouie* as extending so far. Those decisions instead have uniformly viewed Bouie as restricted to its traditional due process roots. In doing so, they have applied *Bouie's* check on retroactive judicial decisionmaking not by reference to the ex post facto categories set out in *Calder*, but, rather, in accordance with the more basic and general principle of fair warning that *Bouie* so clearly articulated. See, e.g., *United States v. Lanier*, 520 U.S. 259, 266, 137 L. Ed. 2d 432, 117 S. Ct. 1219 (1997) ("Due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope"); *Marks v. United States*, 430 U.S. at 191-192 (Due process protects against judicial infringement of the "right to

15

> fair warning" that certain conduct will give rise to criminal penalties); *Rose v. Locke*, 423 U.S. 48, 53, 46 L. Ed. 2d 185, 96 S. Ct. 243 (1975) (per curiam) (upholding defendant's conviction under statute prohibiting "crimes against nature" because, unlike in *Bouie*, the defendant "[could] make no claim that [the statute] afforded no notice that his conduct might be within its scope"); *Douglas v. Buder*, 412 U.S. 430, 432, 37 L. Ed. 2d 52, 93 S. Ct. 2199 (1973) (per curiam) (trial court's construction of the term "arrest" as including a traffic citation, and application of that construction to defendant to revoke his probation, was unforeseeable and thus violated due process); *Rabe v. Washington*, 405 U.S. 313, 316, 31 L. Ed. 2d 258, 92 S. Ct. 993 (1972) (per curiam) (reversing conviction under state obscenity law because it did "not give fair notice" that the location of the allegedly obscene exhibition was a vital element of the offense).
>
> Petitioner observes that the Due Process and Ex Post Facto Clauses safeguard common interests -- in particular, the interests in fundamental fairness (through notice and fair warning) and the prevention of the arbitrary and vindictive use of the laws. Brief for Petitioner 12-18. While this is undoubtedly correct, see, e.g., *Lynce v. Mathis,* 519 U.S. 433, 439-440, 137 L. Ed. 2d 63, 117 S. Ct. 891, and n. 12 (1997), petitioner is mistaken to suggest that these considerations compel extending the strictures of the Ex Post Facto Clause to the context of common law judging. The Ex Post Facto Clause, by its own terms, does not apply to courts. Extending the Clause to courts through the rubric of due process thus would circumvent the clear constitutional text. It also would evince too little regard for the important institutional and contextual differences between legislating, on the one hand, and common law decisionmaking, on the other.

532 U.S. 458-460.

This quotation from *Rogers* makes it abundantly clear that the Ohio Supreme Court did not misapply *Collins* or *Bouie* in this case. In *State v. Jenks*, 61 Ohio St. 3d 259, 574 N.E. 2d 492 (1991), the Ohio Supreme Court had abolished the rule of *State v. Kulig,* 37 Ohio St. 2d 157, 309 N.E. 2d 897 (1974), which had required that, in a criminal case dependent on circumstantial evidence alone, the evidence had to be completely inconsistent with any reasonable theory of defendant's evidence. In this case, the Ohio Supreme Court applied *Jenks* rather than *Kulig*. But

16

what Jenks did was to change a rule of evidence, not an element of the crime of aggravated murder. Petitioner can scarcely claim that he governed his primary conduct with respect to this murder by the rule in *Kulig* and more than the defendant in Rogers could reasonably have relied on the year-and-a-day rule when attacking his victim.[4]

Therefore, Petitioner's Fifteenth Claim for Relief is also without merit.

## Conclusion

The Magistrate Judge again respectfully recommends that the Second Amended Petition be dismissed with prejudice.

August 9, 2005.

s/ **Michael R. Merz**
Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for

---

[4] In contrast to his primary conduct, Webb makes the completely conclusory claim that his "defense was based on the principles announced in *Kulig*" (Objections, Doc. No. 79, at 53), but he never gives a clue as to how he based his defense on *Kulig*.

the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).